Oh yes, oh yes, oh yes. The Honorable Health Court, 5th District, Seddon-Olen, W.C. Good morning, counsel. Our first case today, 523-1148, People v. Chambers. And we have the appellant on his name, Mr. Dendick, correct? Yes. And Ms. Ray, on behalf of the appellant, correct? Correct, Your Honor. All right, counsel, are you ready to proceed? Yes, Your Honor. May it please the Court, good morning, Your Honor. It's a counsel by the name of Jesus Hendricks, and I represent People v. Chambers. The court should review Head Chambers' case in the Second State Post-Conviction Proceedings of the Appointment of Counsel, where the Post-State Post-Conviction Petition presented a constitutional claim with an arguable basis of the fact and the law that direct appeal counsel provided ineffective assistance. Chambers' claim is predicated on two areas of on-the-record ineffective assistance by trial counsel that direct appeal counsel should have but did not raise. First, trial counsel provided ineffective assistance by failing to assert defensive willing and requested the jury be instructed on their affirmative defense, where the trial evidence met the slight evidence standard for such an instruction. Second, trial counsel was ineffective by failing to elicit evidence during the trial, which she later presented in sentencing that Chambers had been shot less than a year before the incident. Whether either or both of these constitutional claims meet the low-high disbanded first state petition, certain court hearings rarely distinguish the petition. Beginning with the defensive willing claim, nearly 75 years ago, our state's Supreme Court held that it was a matter of history that defensive habitation has been the most favored branch of self-defense from the earliest times dating back to English common law. Thus, it should come as no surprise that our Supreme Court at the dawn of the 20th century firmly held that a person defending their willing may resist force with force and impose an unlawful entry against their will by one who in a violent manner attempts to enter with the purpose of assaulting or offering violence to them, even to the extent of taking life, although the circumstances may not be such as to justify belief that there was actual peril or likely of a great violent harm. That last part from our Supreme Court was vitally crucial to this appeal as to whether or not Chambers' jury believes it justified the use of force defense has little or no impact on the current claim predicated upon defensive willing or why trial counsel is ineffective for not raising an entry to trial. This is because our legislature codified that Supreme Court language in 720 ILCS 5-7-2. Those protections are noticeably stronger than those contained in Section 7-1, the use of force of defense of a person's provision, which requires that if deadly forces be used, the defendant reasonably believes that such force is necessary to prevent human death or great violent harm to himself or another for the permission of a forcible felony. Unlike those strictures, Section 7-2, defense of dwelling, really requires, prior to the use of deadly force, that the other person's any intent of education or attack on the dwelling is, one, in a violent, riotous, or commensalist manner, and that the defendant believes deadly force is necessary to prevent either an assault or offer of personal violence to him or another in the dwelling, or two, the defendant believes deadly force is necessary to prevent the commission of any type of felony in the dwelling. Part and parcel of these protections in Section 7-2 is that a defendant need not wait for the other person's entry to the dwelling to actually occur prior to using deadly force. Thus, Section 7-2 authorizes force earlier than in comparable situations. With those doctrines governing Chambers' constitutional claim, his petition made an arguable basis in back-to-the-law that trial courts perform ineffectively when she failed to employ defensive dwelling, given the evidence enlisted during the trial. Initially, what occurred on the night of December 30, 2018, was not an isolated incident of deceit and Bernice Riley's punitive behavior, which evidence demonstrated that sometime in November or December 2018, Riley likely abused his girlfriend, Danica, pushing her into a wall at the apartment she shared with her sister, Demetria, who was Chambers' girlfriend. A few weeks later on Christmas Eve, another argument between Riley and Danica occurred that led to Riley telling Chambers, Demetria, and Danica that Riley was, quote, going to have the crib shot up. He was going to have that resident shot up. Thus, it is unsurprising that about a week later on the night of the incident, Riley's actions turned violent, riotous, and tumultuous. As Chambers and Demetria were in the apartment to discuss their plans after another incident involving Danica and Danica's sister, Riley arrived at the apartment building. Upon his arrival, Riley began yelling and screaming obscenities at physically threatening Chambers upstairs in the apartment, while at the same time, Riley banged on the building's security gate, attempting to violently and riotously enter it. This disturbed Danica so much that she ran downstairs to stop Riley from threatening Chambers and to calm him down. Danica admitted that Riley was so hostile that she had her arms around his neck trying to keep Riley downstairs while he was inside the building's security gate. Demetria and Chambers thereafter came downstairs to the building's counter lobby at the security gate. Chambers testified that they made this decision because he believed Riley would make it upstairs and Chambers and Demetria would be stuffed inside their apartment. Council, if I may interrupt you for a moment. So Riley, is there any evidence that Riley ever got through the security gate? Yes, so what I just described when Danica had her arms around the neck of Riley while he was still hostile, he was inside the security gate at that point, yes. And how close did he actually get to the front door of the building? You know, if you take a look at the exhibit, it's indicated straight on where that security gate is and there's like a common stairwell between the apartment buildings and then basically a few steps in there is where the door is at. It's from what the exhibit is we can tell. And the defendant in this case testified that Riley was yelling for him to come outside and indicated that he would catch him in the streets and then the defendant came downstairs and actually pushed through this gate toward Riley and then this fight ensues outside of the gate. Is that correct actually? It's not correct anymore, Your Honor. The drive-by was catching the street once everyone was already downstairs. There was a lot of profanity and threats upstairs. It wasn't specifically like, Paul, I'm going to do X, Y, Z upstairs. But it was enough that it caused Danica to rush downstairs, grab ahold of Riley by his neck because they restrained him. Now once Danica and Chambers were downstairs, there was this comment about, well, if I'm not going to get you now, it's for later basically. And also, however, Riley then stated, I'm going to quote, and this is at 966 of Chambers' testimony, quote, I'm going to catch your bitch ass at the gates. When he said that, he branched the firearm and it was right there so I could see the firearm clearly. Based on that trial evidence, thereafter then, Chambers approaches Riley just outside the security gate. Riley throws the first punch. And then during that fight, Chambers gains control of the firearm and eventually shoots a single time. So based on all that trial evidence, trial counsel was ineffective for deploying, not deploying, defense's dwelling where Riley's actions were, of course, violent and riotous and tumultuous and where the trial evidence satisfied that slight evidence standard for instructions. This would have also meant the second aspect, that's dwelling as to committing a felony within the dwelling, also would have supported Chambers' subjective belief. Even if this didn't end up getting a not guilty on first degree, this would have supported his subjective belief for unreasonable defensive dwelling, which would result in second degree murder. Thus, under any theory available here, trial counsel was ineffective for not raising this defense. It's not like we're just going to go on sufficiency. No, we were raising justifying use of force. There's no reason not to apply this defense, at least based on the record we have now. Maybe something comes out of evidentiary hearing via trial counsel discussions with Chambers that would undercut this all. But right now, we need an evidentiary hearing on this issue. If I may turn to the second issue, second part of the claim quickly, Your Honor. You may.  Trial counsel also performed ineffectively by not listening to Chambers during his trial testimony. The effect of being a prior shooting victim, it had on Chambers' actions in December of 2018. The direct appeal record shows Chambers had been shot in the lower back in March of 2018, and that the bullet remained inside Chambers. Chambers appeared in his post-conviction petition that he provided the medical records of the prior shooting to trial counsel before trial. Equally known as the 2014 First District College case, Demonstration Petitioner makes an arguable claim of ineffective assistance in such situations. The Miller of the prior shooting occurred seven years prior to the charge case, and the claim of Miller is such that the state there only contested the procedural bar, which the appellate court turned to say. Where defendant's perception of danger is always material and relevant, Chambers' trial counsel provided arguably ineffective assistance by not listening to March 2018 prior shooting that's effected Chambers, and it would also support a second-degree murder, lesser mitigated events. Assuming that it's in claim for a love record on direct appeal, the state has not contested that, then direct appeal counsels arguably provided ineffective assistance by not raising them, or either or both, showing that direct appeal counsel is ineffective. The result is the same. This court should remand Chambers' petitions for second-stage proceedings with the appointment of counsel. And can I ask a number of questions? Justify any questions. No questions. Justify any questions. May I ask a clarification, please? The thrust of your argument on this second point is the effect of the previous shooting on the subjective perception of the defendant, correct? Is that what the thrust of the argument is? It's both subjective. It would, for sure, go to subjective. What Chambers' prior shooting and being convicted nine months prior, of course, would affect subjective. It would also affect the jury's determination of what an objective person is, because you also take for an objective where that person stood on the day that the actions occurred. And so this would affect the jury's determination of what an objective person in the same situation would have done. Okay, thank you. Your Honor. Thank you, counsel. Counsel for the affiliate, Ms. Gray, you may proceed. May it please the court, counsel. I am Becky Gray, arguing for the people. In my argument today, I'd like to explain why trial counsel was not ineffective for not raising the affirmative defense of defensive dwelling. I'll stand on the arguments in the State's brief for the other sub-issues, unless the court has specific questions about those. Quite simply, the affirmative defense of defensive dwelling was not a meritorious defense. Defensive dwelling requires a reasonable belief that defendant's conduct was necessary to prevent or terminate another's unlawful entry into or attack upon a dwelling. Riley, the victim, was not attempting to enter the dwelling. He was banging on the gate and yelling, sure, trying to entice the defendant to exit the apartment, the dwelling, and fight him. To that extent, the victim was successful. Defendant did exit the apartment, the dwelling. At that point, there was no entry into a dwelling to prevent it because the parties were not inside the apartment any longer. Counsel, did Riley ever get through the gates? No, Your Honor. I can see where that is in the record. Okay, thank you. And I can tell you where that is in the record. It is at R1, which is Danika's interview, and she also says the transcript bears, I think, Exhibit 197, I believe is where that is, E197, where she says that he never stepped foot inside the gate, even when she had the gate open. And I think there's disagreement between the state as to her actions in putting her arm around Riley when she had that gate open. She was whispering in his ear. She wasn't physically restraining him. She was telling him to calm down. And that is also in the record as well. I can't lay hands on that at the moment, but if the court would like, I will get that information for you. But there's some disagreement about what her actions were, and I think it's clear that with the gate open, had Riley ever intended to enter the dwelling violently or otherwise, that would have been his opportunity. Yet he never stepped foot inside the gate, according to Danika's interview, which occurred within hours of his death. So, again, there was no entry into a dwelling to prevent at that point because all the parties were outside of the dwelling in, as counsel put it, the common stairwell vestibule area of the apartment building. And Defendant didn't more than just exit the building. He approached the gate. He forcefully exited the gate, so forcefully, in fact, that the gate hit the victim in the face, knocked him back a couple of steps, and allegedly knocked a gun that only Defendant saw from his hand. That gate had been being held closed by Danika, not to keep Riley out because, as the testimony is clear from trial, that gate locked itself when it was closed. You could only get in with a key. Defendant's testimony even established that. Danika was holding the gate closed from the Defendant, who tried not once, not twice, but three times to push through that gate, and when he was finally successful, the tussle occurred outside the gate. The murder occurred outside the gate because Defendant exited the gate. Counsel, how much time elapsed in the record? Is this actually undisputed? How much time elapsed between the time the Defendant exited the gate until the shooting? From the testimony, I believe it was mere minutes. From the time Defendant exited the gate, it's my understanding that Riley punched him immediately and Defendant reciprocated in that respect. There was some testimony that Defendant initially went to his vehicle first, but there's conflicting testimony on that. Some said the fight ensued right away and that he didn't go to his vehicle first. I believe it was just a matter of minutes that this occurred. Defendant's own testimony even confirms that Riley was not even trying to enter the gate. The gate is on the first floor. The dwelling, their apartment, was on the second floor. Not only was Riley not even trying to enter the gate, he was not even close to entering the dwelling, so there was no dwelling to protect. And it wasn't Riley who was trying to get Danica to remove her hand from the gate. It was the Defendant and Demisha, Danica's sister. And that citation I gave, the E197, was correct, that Riley never entered the gate. So there was no entry or no even attempt to enter. There was a loud ruckus, and some could characterize it as hostile, and there was some profanities, but that doesn't make the banging on the gate or the yelling violent or riotous or tumultuous. And if that is the case, there was still no entry, again. And Defendant asserts that this is a textbook case for defensive dwelling, and in his brief he cites the home invasion statute as an example supporting his claim that defensive dwelling should have been raised as a defense. But the home invasion requires an unauthorized entry. We don't have that here because Danica invited Riley to the apartment. There is evidence, also I think it's at E193 and E194, that she couldn't sleep because of the ensuing argument that had occurred in the apartment between the Defendant and her sister and Riley's sister earlier in the evening. And so she wanted to pack up and leave, and she called Riley to come and help her pack up. As a resident in that home, in that dwelling, she invited him there. So even if he had entered, again, no evidence that he did or even tried to, it would have been an authorized entry, not an unauthorized entry. So it doesn't meet the home invasion statute, which Defendant cites in his brief. And also home invasion requires the person trying to enter to know that there are other persons present. Again, they weren't present in the dwelling. There was no one present in the dwelling. They were all outside the dwelling. Uses force or threatens imminent use of force is also required for home invasion. Defendant didn't force his way in, not even when the gate was open. The threats of force were for future harm. The statute requires imminent harm. The victim had resigned himself to the fact that he wasn't going to harm Defendant then. Defendant even said the victim, quote, realized he wasn't going to be able to bait me outside, end quote, and he'd catch him later in the streets. So no imminent harm. And there's a part of the home invasion statute which Defendant has left out of his quotation, his citation to that statute. And it is, quote, and personally discharges a firearm. Defendant didn't include that in the home invasion statute he cited. And the only person who saw, allegedly saw Riley with a firearm was the Defendant. The uninterested witnesses, Hortensia Morales and West, neither of them saw Riley with a weapon. But Morales did see the Defendant raise his right arm, reach his right side and raise his right arm, and he had the gun. The only person who personally discharged the firearm that night was Defendant. And that was to murder the victim, who wasn't violently, tumultuously, or riotously trying to enter any dwelling. Defendant also asserts that Riley threatened to commit aggravated battery on Defendant, but he doesn't cite the specific subsection. Regardless, none of those sections of the aggravated battery statute would apply here. And Defendant, even in his opening argument, didn't cite to which section of the aggravated battery statute that Riley would supposedly be violating if he were to enter the apartment. Essentially, the record rebuts that trial counsel was ineffective for failing to raise this allegedly affirmative defense. Neither the facts nor the law support this defense in this case. And trial counsel is not required to raise non-meritorious issues to be effective, and appellate counsel is not required to raise every conceivable issue. And this is especially true when the issues that the Defendant alleged trial counsel should have raised had no merit in the trial court. And that's exactly the situation here. The trial court did not commit error in dismissing the Defendant's pro se post-conviction at the first stage because his petition was frivolous and patently without merit. And for all the reasons argued here and in our brief, we ask this court affirm the trial court's dismissal. Thank you. Justify any questions. The gun was found, there was a gun found under the victim's body. Yes. There's no evidence in the record linking that gun to any person, only the testimony of West that they saw the Defendant hovering over the body for a few seconds after the shooting. Is that right? That is correct, that the West saw the Defendant lean over the body for three or four seconds. It's undisputed that the Defendant had that weapon. He even said so himself. He said that he basically disarmed the victim, Riley, when he hit him with the gate, and that he picked up the gun and while he was fist fighting with Riley, continued to hold onto that gun, which is a credulous testimony. But there was a stipulation that that weapon was the murder weapon. However, I don't believe there was anything linking that gun to anyone specifically, although they did find weapons and ammunition in Demisha and Danika's apartment, covered in men's clothing. They also found it at the Defendant's parents' home. They found some ammunition which matched the same caliber as that used in the firearm that killed Riley. Thank you. Any other questions? Justice Hackett, any questions? No, thank you. All right, thank you, Counsel. Thank you. If you'll have an opportunity to address us in rebuttal, you may proceed. And you're muted, Counsel. I apologize, still muted there. Just a few comments in rebuttal, Your Honor. The State makes a lot of focus of their defense of dwelling argument on that Riley either never got up to the front to the apartment store or never got into the apartment store. But it's been over 50 years since the only Supreme Court stated that the right extends beyond the threshold of the dwelling. And I think the State's argument just highlights why an evidentiary hearing at the trial counsel's decision or lack thereof here is necessary because there are some facts that the State is eliciting. Does that already extend in a common area where you have a right to be at if it's your dwelling down towards the security gate? And to respond to the State's argument that Riley was never inside the gate, that's not my reading of the testimony of pages 639 and 640 of the current record. Again, exhibit R1, which is Danika's videotape statement hour after the incident. And this court can look at that. The State ignores Riley's threat at the security gate. Quote, again, I'm going to catch your bitch ass at the gate. And when he said that, he brandished a firearm. He was right there so I could see the firearm clearly. Whether that is the jury ultimately ends up believing Gene Bridger's testimony on this, that is an issue for the trier of fact only. We do not persuade evidence standard to determine whether that was credible or not. This should have been presented to the jury in defense of dwelling. And the State also ignores the lingevance here and its impact on defense of dwelling. Specifically, Riley threatening to shoot up the apartment just a week before the incident. And he has a gun, according to Gene Bridger's testimony. Defense of dwelling, of course, should have been raised here by trial counsel. It was sufficient performance by trial counsel not to present this to the jury. There was slight evidence that Trotman would have erred in denying the destruction on defense of dwelling based on what was presented during the trial. And it is at least arguable at this stage that Chambers was pregnant by that deficient performance. Because either it would have been a not guilty verdict or a finding on the lesser mitigated offense of second degree murder for defense of dwelling. And if your honors have no further questions, just one last point as to this threshold and where defense of dwelling can be executed at. The smallwood case points out you don't have to have actual entry into that house. If the people outside can still use deadly force. And that's been the state of our case law for over half a century. So the state's just wrong in that aspect. And if your honors have no further questions on this issue or the sentencing issue, we ask for the relief requested in the briefs and we thank you for your time. Also, I want to thank counsel for not opposing my motion to do this argument remotely. And thank your honors for granting that motion. It's much appreciated. Any questions, Justice Hackett? No questions. Justice Hackett? No thank you. All right, thank you, counsel. We will take this matter under advisement and issue a decision in order in due course. Have a nice day. Thank you. We will be in recess for a few minutes while we set up the next Zoom.